IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JEFFERY EUGENE WILLIAMS,                                                                PLAINTIFF

V.                                                                    CIVIL ACTION NO. 1:20-CV-24-RPM

JOE ERRINGTON, ET AL.,                                                                 DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

### I.     Introduction

On January 22, 2020, plaintiff Jeffrey Eugene Williams ("Williams"), proceeding *pro se* and *in forma pauperis*, filed a 42 U.S.C. § 1983 ("Section 1983") civil rights complaint against South Mississippi Correctional Institution ("SMCI") Superintendent Joe Errington ("Errington"), Area 1 Warden Georgia Shelby ("Shelby"), Deputy Warden Timothy Barnes ("Barnes"), and Corrections Officer Jacqueline Leverette ("Leverette") (collectively, "defendants") alleging violations of his constitutional rights. Doc. [4]; [37], Ex. 1. Before the Court are two motions: (i) a motion for summary judgment filed by the defendants, and (ii) an unspecified "dispositive" motion filed by Williams. Doc. [36–37].

### II.    Relevant Procedural Background

Following a June 15, 2021 *Spears* hearing, this Court set a preliminary dispositive motions deadline. Doc. [37], Ex. 1, (T. 45–47); [30]. As a matter of course, preliminary dispositive motions only encompass threshold matters, such as the failure to state a claim, the failure to exhaust remedies, or statute of limitations-related issues. *Ibid.* Absent a specific court order—there was none present here, the Court does not grant defendants leave to seek summary judgment on the merits of an inmate's claims prior to discovery. Since the defendants' instant motion goes beyond the Court's scheduling order by seeking summary judgment on the merits of Williams' claims,

1

Doc. [37], the defendants' motion is premature and fails as a summary judgment motion. Doc. [30]. Nevertheless, the Court will construe the defendants' motion as a Rule 12(b)(6) motion to dismiss.[1] Doc. [37]. Furthermore, the Court construes Williams' unspecified "dispositive motion" as an unsworn response in opposition to the defendants' motion.[2] Doc. [36]. Now, the Court turns to the merits of the defendants' motion. Doc. [37].

### III.  Facts

In September and October 2019, Williams was an inmate housed in Area 1, Unit 10 at SMCI. Doc. [4]. Williams was employed as a "hall man unit support worker," or "trustee," in the unit— a unit that he describes as "quiet" with "seldom [or] no fights." Doc. [4], at 13; [37], Ex. 1, (T. 11). Indeed, Williams was never threatened in Unit 10. Doc. [37], Ex. 1, (T. 38–39). According to Williams, he "respect[ed] all officers" and "never smart-mouthed" an officer. *Id.*, Ex. 1, (T. 14). However, when Williams was moving mattresses in late-September, Leverette, who was supervising Williams, began to claim that he had a "smart ass mouth" and that she was going to inform Barnes about it. *Id.*, Ex. 1, (T. 14). Leverette also began referring to Williams as "Officer Williams" in front of other inmates to create "problems" for him. *Id.*, Ex. 1, (T. 15). Williams subsequently wrote a private letter to Barnes about Leverette's conduct. *Id.*, Ex. 1, (T. 14). Soon after, Barnes visited the prison unit and spoke with both Leverette and Williams. *Ibid.* After Barnes' visit, Leverette's conduct only "got[] worse." *Id.*, Ex. 1, (T. 15).

---

[1] Consistent with Rule 12, the Court has not considered evidence or arguments from evidence outside of Williams' supplemented Complaint in connection with the defendants' construed motion. Doc. [4]; [37], Ex. 1. *See also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

[2] Williams did not identify the type of dispositive motion that he filed. Doc. [36]. Williams' motion cannot be construed as a merits summary judgment motion because, like the defendants, he is also presently not allowed to file such a motion. However, since the defendants do not assert any claims against Williams, he cannot file a Rule 12(b)(6) motion, either. For these reasons, only at present, the Court will construe Williams' "dispositive motion" as an unsworn response in opposition to the defendants' motion to dismiss. Doc. [36]. In any event, Williams' motion contains nearly identical information to that put forth put forth in his supplemented Complaint. *Wilson v. Barrientos*, 926 F.2d 480, 482 (5th Cir. 1991).

At the end of September, Williams filed a formal grievance in which he made allegations about Leverette's conduct. Doc. [37], Ex. 1, at (T. 15, 17–18). On October 8, 2019, Williams was ordered to move to Unit 8. *Id.*, Ex. 1, (T. 16). Before moving, he asked Case Manager Hodge ("Hodge") for an explanation about the sudden transfer. *Ibid.* Hodge showed her computer screen to Williams, which displayed an order for Williams' transfer, signed by Barnes and Shelby, with the following reason attached: "Sergeant Leverette said inmate had trafficked." *Id.*, Ex. 1, (T. 19, 21). There was no further elaboration on what Williams allegedly transferred. Leverette submitted the allegation on October 7, 2019. *Id.*, Ex. 1, (T. 20, 30). According to Williams, Barnes and Shelby knew that he did not "traffic" but did not question Leverette's false allegation. *Ibid.* Notwithstanding the allegation, Williams did not receive any rule violation report ("RVR") documentation, a hearing, formal discipline, or a reclassification. *Id.*, Ex. 1, (T. 20–21, 25, 38).

Leverette's trafficking allegation had two overarching consequences for Williams. For one, Williams lost his job and was barred from holding that position again. Doc. [37], Ex. 1, (T. 44). Additionally, Williams was transferred to a "worse," more violent prison unit, which, *inter alia*, housed: violent inmates awaiting transport to higher security prisons; inmates changing custody classifications at SMCI; inmates with "multiple" RVRs; and inmates with "major" RVRs. *Id.*, Ex. 1, (T. 37). Furthermore, two "gang-affiliated" inmates from Williams' old unit, who were previously reported by him for violations, were also housed in Unit 8. *Id.*, Ex. 1, (T. 38). Within 24 hours of Williams' arrival at Unit 8, the "gang-affiliated" inmates threatened to physically harm him. Dc. [4], at 13; [37], Ex. 1, (T. 39). After being threatened, Williams "red tagged" one of the "gang affiliated" inmates and was moved to a different prison unit in Area 2. Doc. [4], at 13. Williams was subsequently threatened in that unit, too. *Ibid.* This action followed. Doc. [1].

3

### IV.     Construing Williams' Supplemented Complaint

The Court begins by liberally construing, *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam), Williams' supplemented Complaint, Doc. [4]; [37], Ex. 1; *Wilson*, 926 F.2d at 482. First, Williams alleges that the defendants violated his Fourteenth Amendment rights by (i) firing him from his trustee position without due process, and (ii) transferring him to a different prison unit without due process. Doc. [4], at 12; [37], Ex. 1, (T. 28–30, 43–44). He further alleges that Errington, Shelby, and Barnes, in particular, violated his Fourteenth Amendment rights by failing to investigate his grievance allegations. *Ibid.* Second, Williams is suing Leverette for retaliating against him for writing a grievance about her conduct. Doc. [4]; Doc. [37], Ex. 1. Third, and finally, he asserts a supervisory liability claim against Errington, Shelby, and Barnes. Doc. [37], Ex. 1, (T. 28, 30). He sues the defendants in both their individual and official capacities. Doc. [4], at 2–3.

### V.     Standard of Review

In evaluating a Rule 12(b)(6) motion to dismiss, the court "must accept all well-pleaded facts as true, and [] view them in the light most favorable to the plaintiff." *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* "Threadbare recitals of the elements of a cause of action, [however,] supported by mere conclusory statements, do not suffice[]" as factual allegations and are viewed instead as legal conclusions couched as

factual allegations. *Ibid.* Finally, the Court's review encompasses: "'the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Funk*, 631 F.3d at 783 (quotation omitted).

## VI.   Analysis

### A. Sovereign Immunity

Pursuant to the Eleventh Amendment, "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (collecting cases). This means that the State sovereign, including its departments and agencies, is generally immunized from cases seeking monetary damages or equitable relief. *Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). There are, however, exceptions to the general rule of sovereign immunity: (i) a state may consent to be sued, *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675–676, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); (ii) Congress may "unequivocally" abrogate state immunity through "a valid exercise of [its] power," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); or (iii) a litigant may sue a state official in his official capacity seeking prospective injunctive relief to redress an ongoing violation of federal law, *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

Here, the Mississippi Department of Corrections is an "arm" of the State of Mississippi and, thus, the defendants are generally entitled to raise sovereign immunity as an affirmative defense to suit in federal court. *See, e.g.*, *Brown v. Perry*, No. 3:19–CV–544–RPM, 2021 WL 1160964, at *5 (S.D. Miss. Mar. 25, 2021). Furthermore, Mississippi has not waived sovereign immunity in Section 1983 cases, including the present case. Miss. Code Ann. § 11–46–5(4). Similarly,

Congress did not abrogate state sovereign immunity in cases arising under Section 1983. *Quern v. Jordan*, 440 U.S. 332, 340, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979). Finally, Williams cannot proceed with his lawsuit under the *Young* exception. To proceed under *Young*, "a complaint must allege that the defendant *is violating* federal law, not simply that the defendant has done so." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (emphasis in original) (citation omitted). Assuming *arguendo* that Williams seeks prospective injunctive relief, his Complaint only encompasses events occurring in 2019. Doc. [4]; [37], Ex. 1. Since Williams only seeks prospective injunctive relief arising from *previous* alleged constitutional violations—not an ongoing violation, he cannot proceed under *Young*. *NiGen Biotech, L.L.C.*, 804 F.3d at 394. Therefore, the defendants are entitled to sovereign immunity insofar as he sues them in their official capacity.

### B.  Due Process

#### i.  Prison Job Assignment

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.'" *Nutall v. Maye*, 515 F. App'x 252, 254 (5th Cir. 2012) (quotation omitted). "Only after a claimant has made such a showing will th[e] [C]ourt consider whether the procedures attendant upon the deprivation were deficient." *Id.* (citation omitted). As a general matter, to establish a property interest, "a person clearly must have more than an abstract need or desire for it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). However, it is well-established that "a prisoner does not have a constitutionally protected liberty or property interest in a particular prison job that would give rise to a constitutional claim related to losing the job." *Howard v. Davis*, No. 5:14–CV–14–KS–MTP,

2014 WL 7334531, at *2 (S.D. Miss. Dec. 19, 2014) (citing *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 49 (5th Cir. 1995)).

Here, Williams alleges that his Fourteenth Amendment rights were violated because he lost his trustee position without due process. Doc. [37], Ex. 1, (T. 43–44). However, as stated above, "[a]n inmate's expectation of keeping a specific prison job, or any job, does not implicate a [constitutionally] protected interest." *Howard*, 2014 WL 7334531, at *2 (quoting *Bulger*, 65 F.3d at 49). Since Williams lacks a constitutionally protected interest in his trustee position, he has failed to state a Fourteenth Amendment due process claim related to that position. *Ibid.*

### ii.     Unit Transfer

The Due Process Clause does not "in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system[,]" *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), or transfer within the same prison, *see, e.g.*, *Taylor v. Carlize*, 172 F. App'x 589, 590 (5th Cir. 2006), even if the new prison or unit has harsher conditions, *Meachum*, 427 U.S. at 225, 96 S.Ct. 2532. Nevertheless, "in the specific context of *administrative lockdown*," an inmate who demonstrates "atypical and significant hardship[,]" i.e. "extraordinary circumstances," is entitled due process protection related to prison housing. *Wilkerson v. Goodwin*, 774 F.3d 845, 853 (5th Cir. 2014) (emphasis added) (quotation omitted). For example, "extraordinary circumstances" may exist where the prisoner is in lockdown for 30 years, *Wilkerson v. Stalder*, 329 F.3d 431 (5th Cir. 2003), or staying indefinitely at a facility prohibiting human contact for 23-hours per day, *Wilkinson v. Austin*, 545 U.S. 209, 214, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005).

Here, Williams was merely placed in a more violent general population prison unit. Doc. [4]; [37], Ex. 1. He was not placed in an administrative segregation unit. Cf. *Wilkerson*, 774 F.3d at

853. Therefore, he lacks a cognizable liberty interest in his prison housing. Alternatively, Williams has not alleged extraordinary circumstances. Cf. *Wilkerson*, 774 F.3d at 853. For these reasons, he has failed to state a due process claim on this ground. *Taylor*, 172 F. App'x at 590.

### iii.   Failure to Investigate

Finally, an inmate does not have "a federally protected liberty interest in having [prison] grievances resolved to his satisfaction." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005) (per curiam). Since Williams alleges that Errington, Barnes, and Shelby violated his due process rights by failing to investigate his grievance allegations about Leverette, Doc. [4], at 12; [37], Ex. 1, (T. 28–30), he "relies on a legally nonexistent [liberty] interest[] [and] any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless." *Geiger*, 404 F.3d at 374. Williams' failure to investigate claim is meritless and must be dismissed. *Ibid.*

### C.  Retaliation Claim

### i.   Law Generally

To state a retaliation claim, a prisoner must sufficiently plead four elements. *Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017). First, the prisoner must plead that "[he exercised] a specific constitutional right[.]" *Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008). Second, he must plead that the defendant "inten[ded] to retaliate against [him] for his . . . exercise of that right[.]" *Ibid.* In meeting this burden, he must produce "direct evidence of motivation" or "a chronology of events from which retaliation" is inferable. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). The prisoner's "[p]ersonal beliefs and conclusional allegations are not sufficient" to establish a link. *Williams v. Cleer*, 123 F. App'x 591, 593 (5th Cir. 2005) (citation omitted). Third, the defendant must have committed a qualifying retaliatory act against the inmate; a qualifying "retaliatory

8

adverse act . . . [is one] capable of deterring a person of ordinary firmness from further exercising his constitutional rights.'" *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006). However, the retaliatory act itself need not rise to the level of a constitutional violation. *Bibbs*, 541 F.3d at 271. Finally, the prisoner must plead that "but for the retaliatory motive[,] the complained of incident . . . would not have occurred.'" *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018) (quoting *Woods*, 60 F.3d at 1166).

### ii.     Application

Here, starting with the first retaliation element, it is well-established that an inmate has a First Amendment right to file grievances. *Butts*, 877 F.3d at 588. Since Williams alleges that Leverette retaliated against him for filing a grievance, he has properly alleged a protected constitutional right. Doc. [4]; [37], Ex. 1.

Second, Williams has sufficiently alleged a sequence of events leading to an inference of retaliatory intent. He alleges that: (i) Leverette called him "Officer Williams," which can inferred as derogatory in prison, on several occasions, Doc. [37], Ex. 1 (T. 15); (ii) in late-September 2019, Williams filed a grievance alleging misconduct by Leverette, *ibid.*; (iii) on October 7, 2019, Leverette electronically submitted an allegation that she witnessed Williams trafficking, *id.*, Ex. 1, (T. 19, 24); (iv) on October 8, 2019, Williams was removed from his trustee position and moved to a more violent prison unit, *id.*, Ex. 1, (T. 37); (v) Williams did not receive RVR paperwork, a hearing, or formal discipline for "trafficking," *id.*, Ex. 1, (T. 20–21, 25); and (vi) his prison classification did not change, *id.*, Ex. 1, (T. 38). In light of the above, Williams has sufficiently alleged "a chronology of events from which retaliation" is inferable. *Woods*, 60 F.3d at 1166.

Third, Williams has sufficiently pleaded a retaliatory act in part. *Morris*, 449 F.3d at 687. *See also Parker v. Carpenter*, 978 F.2d 190, 192–93 (5th Cir. 1992). Viewing the Complaint in the

light most favorable to Williams, Leverette falsely reported him for "trafficking," in order to have him transferred to Unit 8, a more violent prison unit. Doc. [37], Ex. 1, (T. 21). Since Unit 8 houses: (i) inmates with multiple RVRs; (ii) inmates with major RVRs; (iii) inmates between custody levels; and (iv) dangerous inmates awaiting transfer to higher security prisons, Doc. [4], at 13; [37], Ex. 1, (T. 20–21, 25, 38), the Court infers that Unit 8 is more dangerous than Unit 10 and that those alleged to have trafficked are sent there alongside those formally disciplined. *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992). Furthermore, two "gang-affiliated inmates," previously reported by Williams, happened to threaten him with physical harm within 24 hours of his transfer to Unit 8. Doc. [37], Ex. 1, (T. 39). In light of the above, Williams has sufficiently pleaded that Leverette's retaliatory act—forcing his transfer to Unit 8 through a false allegation—would deter a person of ordinary firmness from filing a grievance in the future.[3] *Morris*, 449 F.3d at 687; *Parker*, 978 F.2d at 192–93.

Nevertheless, Williams failed to state a retaliation claim insofar as the retaliatory act relates to his trustee position. It is well-established that an inmate's mere removal from his prison job assignment would not deter a person of ordinary firmness from further exercising his constitutional rights. *Tighe v. Wall*, 100 F.3d 41, 42–43 (5th Cir. 1996). Instead, the inmate must be reassigned to a significantly worse position before the retaliatory act is considered more than *de minimis*. *Jackson v. Cain*, 864 F.2d 1235, 1250 (5th Cir. 1989) (finding that inmate reassignment from "light work" to backbreaking labor with punishment unit was a qualifying retaliatory act). Since the

---

[3] The defendants appear to conflate due process and retaliation claims as those claims related to prison unit transfers and prison job reassignment. Doc. [38]. The key distinction is as follows. On the one hand, a prisoner has no property or liberty interest in his prison job protected by due process, *Bulger*, 65 F.3d at 49, and only a very limited liberty interest protected by due process in connection with his housing, *Wilkerson*, 774 F.3d at 853. In the retaliation context, however, a retaliatory act need not independently rise to the level of a constitutional violation. *Bibbs*, 541 F.3d at 271. In turn, the Fifth Circuit has identified qualifying retaliatory acts that take the form of a prison unit transfer or prison job reassignment; after all, those acts need not be of a constitutional magnitude. *Parker*, 978 F.2d at 192–93; *Jackson*, 864 F.2d at 1250. As a result, a prison unit transfer/ job reassignment can both suffice as a retaliatory act and fail as a stand-alone due process claim. *Compare Bulger*, 65 F.3d at 49, *with Jackson*, 864 F.2d at 1250.

10

inmate lacks a "constitutionally protected interest in . . . a *specific* work assignment" in the first instance, any prohibition on the inmate's return to his previous position—i.e. a specific prison position—is also not more than a *de minimis* retaliatory act. *Bibbs*, 541 F.3d at 270–71; *Morris*, 449 F.3d at 684. Here, Williams only alleges that Leverette's actions caused him to lose his "coveted" job and prohibited him from reassignment thereto. Doc. [4]; [37], Ex. 1. He does not allege that he was transferred to a significantly worse prison job. *Jackson*, 864 F.2d at 1250. Williams has failed to state a retaliation claim insofar as it is predicated on losing his trustee job.

Fourth, and finally, Williams has sufficiently pleaded causation. *Brown*, 911 F.3d at 245. Williams personally saw his transfer order and the only stated basis for that order was Leverette witnessing Williams "traffic." Doc. [37], Ex. 1, (T. 19, 21). Leverette logged this allegation with the intent to retaliate against Williams by forcing his transfer to Unit 8, a more violent prison unit. *Ibid.* Notwithstanding this transfer, Williams did not receive RVR documentation, a hearing, or formal discipline related to "trafficking." *Id.*, Ex. 1, (T. 21–22). In light of the above, Williams has sufficiently pleaded that, but for Leverette's fabricated trafficking allegation, he would not have been transferred to Unit 8.

Ultimately Williams has sufficiently pleaded a retaliation claim against Leverette insofar as it is premised on his transfer to Unit 8, However, he failed to plead a retaliation claim against her insofar as it is premised on losing his trustee position.

### D. Supervisory Liability

"Under Section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (citations omitted). Instead, supervisors may only be held liable if: "(i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result

11

in [a] plaintiff's injury." *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citations omitted). Under the first, or "direct," theory of liability, a supervisor may be held individually liable if he has "personal involvement" in the underlying "constitutional deprivation[,]" *Thompkins*, 828 F.2d at 304, which requires "affirmative participation," *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008), and "something more than mere presence at the scene where subordinates allegedly violated the plaintiff's constitutional rights[,]" *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008). Under the second, or "failure to train," theory of liability, a supervisor may be held individually liable if he "(1) fails to train or supervise the officers involved, (2) a causal connection exists between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights, and (3) the failure to train or supervise constitutes deliberate indifference." *Bailey v. Lawson*, 614 F. App'x 752, 757 n.23 (5th Cir. 2015) (citation omitted).

Here, the Court begins with Williams' direct supervisory liability claim against Errington, Barnes, and Shelby. Williams is only suing Errington in light of his leadership position at SMCI and alleged failure to investigate Williams' grievance allegations. Doc. [37], Ex. 1, (T. 28–29). Since Williams' failure to investigate allegation fails to state a claim and Williams does not allege that Errington was personally involved in his transfer to Unit 8, Williams has failed to state a direct supervisor liability claim against Errington. *Ibid.* Turning to Barnes and Shelby, for present purposes, Williams sufficiently pleaded that they were personally involved in Leverette's alleged retaliation. Doc. [37], Ex. 1, (T. 29–30). According to Williams, Shelby and Barnes knew that Leverette fabricated the trafficking allegation submitted on October 7, 2019. *Id.*, Ex. 1, (T. 31). Indeed, the only stated reason for his transfer was Leverette's fabricated allegation. *Id.*, Ex. 1, (T. 21–22). Nevertheless, Shelby and Barnes still signed off on his transfer to a more violent prison

unit. *Id.*, Ex. 1, (T. 31). For present purposes, Williams has sufficiently alleged a direct supervisor liability claim against Barnes and Shelby. *Mesa*, 543 F.3d at 274.

Turning to any potential failure to train claim, since Williams cannot sue Errington on a theory of vicarious liability, *Mouille*, 977 F.2d at 929, and does not otherwise allege that he failed to train, Williams has also failed to state a failure to train supervisory liability claim against Errington. Similarly, Williams has failed to state a failure to train supervisory claim against Barnes and Shelby because he does not allege that a failure to train by Shelby or Barnes resulted in his transfer. *Bailey*, 614 F. App'x at 757 n.23. As a result, Williams has failed to state a failure to train supervisory liability claim against Errington, Barnes, and Selby.

### VII.    Conclusion

**IT IS THEREFORE ORDERED AND ADJUDGED** that the defendants' [109] motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. The defendants' motion is granted insofar as Williams' Fourteenth Amendment claims, retaliatory claim based on job loss, and failure to train supervisory liability claims are concerned. Williams' direct supervisor liability claim against Errington is also dismissed. The only remaining claims include: (i) Williams' retaliation claim against Leverette insofar as it is premised on a prison unit transfer, and (ii) his direct supervisory liability claim against Shelby and Barnes. Errington is dismissed as party to this lawsuit. Finally, Williams' "dispositive" motion is **DENIED** for the reasons set forth above. Doc. [36].

**SO ORDERED**, this the 7th day of February 2022.

/s/ *Robert P. Myers, Jr.*
ROBERT P. MYERS, JR.
UNITED STATES MAGISTRATE JUDGE